**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| JIMMIE JOE ROTHROCK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:13CV497 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Jimmie Joe Rothrock, brought this action under the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security, denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). (Docket Entry 2.) The Court has before it the certified administrative record (manually filed and cited herein as "Tr. __"), as well as the parties' cross-motions for judgment (Docket Entries 11, 15; <u>see also</u> Docket Entry 12 (Plaintiff's Brief); Docket Entry 16 (Defendant's Memorandum)). For the reasons that follow, the Court should remand this case for further administrative proceedings.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for DIB. (Tr. 334-36.) Upon denial of that application initially (Tr. 300-01) and on

reconsideration (Tr. 306-08), he requested a hearing before an Administrative Law Judge ("ALJ") (Tr. 309). At that hearing (held April 22, 2009), Plaintiff's counsel presented argument about whether a prior administrative decision on Plaintiff's previous DIB application rendered him ineligible for benefits during the period at issue in his instant DIB application. (Tr. 508-15; see also Tr. 285-95 (ALJ Decision dated Oct. 15, 2004).) The ALJ subsequently dismissed the instant DIB application. (Tr. 298-99.)

Plaintiff sought review by the Appeals Council (Tr. 325-26) and the Appeals Council remanded to an ALJ for consideration of "a report of a consultative psychological evaluation performed in June 2008 . . . to determine whether it is new and material evidence [warranting] . . . a hearing on the merits of [Plaintiff's instant DIB] claim." (Tr. 329.) Plaintiff, his wife, and his attorney thereafter appeared before an ALJ. (Tr. 516-52.) The ALJ then ruled "that the consultative psychological evaluation . . . d[id] constitute new and material evidence" (Tr. 23), but that, after de novo review of the record, Plaintiff did not qualify as disabled under the Act during the relevant time-frame (Tr. 24). The Appeals Council denied Plaintiff's request for review (Tr. 10-12; see also Tr. 18 (Request for Review)), making the ALJ's denial of benefits the Commissioner's final decision for purposes of judicial review.

In denying benefits, the ALJ made the following findings later adopted by the Commissioner:

1.    [Plaintiff] last met the insured status requirements of the [] Act on June 30, 2002.

2.    [Plaintiff] did not engage in substantial gainful activity during the period from his alleged onset date of February 28, 1997 through his date last insured . . . .

3.    Through the date last insured [Plaintiff] had the following severe impairments:  residuals of fractures of the left tibia and fibula with posterior tibial tendon dysfunction;  bilateral pes planus;  and borderline intellectual functioning.

. . . .

4.    Through the date last insured, [Plaintiff] did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . . .

5.    . . . [T]hrough the date last insured, [Plaintiff] had the residual functional capacity to perform sedentary work as defined in 20 CFR [§] 404.1567(a), except that he had mental limitations which restricted him to the performance of simple, routine and repetitive tasks in an environment that required only occasional interaction with supervisors.

. . . .

6.    Through the date last insured, [Plaintiff] was unable to perform any past relevant work.

. . . .

10.    Through the dated [sic] last insured, considering [Plaintiff's] age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that [Plaintiff] could have performed.

. . . .

> 11. [Plaintiff] was not under a disability, as defined
> in the [] Act, at any time from . . . the alleged onset
> date, through . . . the date last insured.

(Tr. 26-36 (bold font and internal parenthetical citations
omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security
Commissioner's denial of social security benefits." Hines v.
Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope
of [the Court's] review of [such a] decision . . . is extremely
limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981).
Even under that extremely limited standard of review, the Court
should vacate the instant denial of benefits and should remand for
further administrative proceedings.

### A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo."
Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead,
the Court "must uphold the factual findings of the ALJ if they are
supported by substantial evidence and were reached through
application of the correct legal standard." Hines, 453 F.3d at 561
(internal brackets and quotation marks omitted). "Substantial
evidence means 'such relevant evidence as a reasonable mind might
accept as adequate to support a conclusion.'" Hunter v. Sullivan,
993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402

4

U.S. 389, 390 (1971)).  "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted).  "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." <u>Hunter</u>, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." <u>Mastro</u>, 270 F.3d at 176 (internal brackets and quotation marks omitted).  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." <u>Id.</u> at 179 (internal quotation marks omitted).  "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to

5

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[1] "To regularize the adjudicative process, the Social Security Administration has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of Soc. Sec. Admin., 174 F.3d 473, 475 n.2

---

[1] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

6

(4th Cir. 1999).[2]  A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied.  The second step determines if the claimant is 'severely' disabled.  If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, the "claimant is disabled." Mastro, 270 F.3d at 177.  Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[3]  Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled.  Id. at 179-80.  However, if the claimant establishes an inability to

---

[2]  "Through the fourth step, the burden of production and proof is on the claimant.  If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

[3]  "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . mean[ing] 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)).  The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265.

return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[4]

## B. Assignments of Error

Plaintiff asserts that the Court should overturn the ALJ's finding of no disability on these three grounds:

1) "[t]he ALJ erred by failing to find that [Plaintiff] met listing 12.05C" (Docket Entry 12 at 6);

2) "[t]he ALJ committed error by failing to obtain the testimony of a vocational expert" (id. at 10 (italics omitted)); and

3) "[t]he ALJ erred by failing to make the more detailed assessment required by [Social Security Ruling] 96-8p" (id. at 16 (italics omitted)).

---

[4] A claimant thus can establish disability via two paths through the SEP. The first requires resolution of steps one, two, and three for the claimant, whereas, on the second, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that a ruling against a claimant at step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

8

Defendant contends otherwise and seeks affirmance of the ALJ's decision.  (See Docket Entry 16 at 5-20.)

### 1.  Listing 12.05C

"Under Step 3, the [SEP] regulation states that a claimant will be found disabled if he or she has an impairment that 'meets or equals one of [the] listings in appendix 1 of [20 C.F.R. Pt. 404, Subpt. P] and meets the duration requirement.'" Radford v. Colvin, 734 F.3d 288, 293 (4th Cir. 2013) (quoting 20 C.F.R. § 404.1520(a)(4)(iii)) (internal bracketed numbers omitted).  "The listings set out at 20 CFR pt. 404, subpt. P, App. 1, are descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect.  Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results." Sullivan v. Zebley, 493 U.S. 521, 529-30 (1990) (internal footnote and parentheticals omitted).  "In order to satisfy a listing and qualify for benefits, a person must meet all of the medical criteria in a particular listing."  Bennett, 917 F.2d at 160 (citing Zebley, 493 U.S. at 530, and 20 C.F.R. § 404.1526(a)).

According to Plaintiff, "[t]he ALJ erred by failing to find that [Plaintiff] met listing 12.05C."  (Docket Entry 12 at 6.) That listing states:

> 12.05 *Mental retardation*:  Mental retardation refers to significantly subaverage general intellectual functioning

9

> with deficits in adaptive functioning initially
> manifested during the developmental period; i.e., the
> evidence demonstrates or supports onset of the impairment
> before age 22.
>
> The required level of severity for this disorder is met
> when the requirements in A, B, C, or D are satisfied.
>
> . . . .
>
> C. A valid verbal, performance, or full scale IQ of 60
> through 70 and a physical or other mental impairment
> imposing an additional and significant work-related
> limitation of function . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (emphasis added).[5]  A

claimant thus can meet Listing 12.05C by establishing:

1) "deficits in adaptive functioning initially manifested

during the developmental period; *i.e.*, the evidence demonstrates or

supports onset of the impairment before age 22 (Prong 1)," Hancock

v. Astrue, 667 F.3d 470, 473 (4th Cir. 2012) (internal quotation

marks omitted); see also id. at 475 (observing that Prong 1

consists of "two components," "deficits in adaptive functioning

generally and also . . . [such] deficiency manifest[ing] itself

before the age of 22");

2) "a valid verbal, performance, or full scale IQ of 60

through 70 (Prong 2)," id. at 473 (internal quotation marks

omitted); and

---

[5]  Effective September 3, 2013, the Social Security Administration replaced the
term "mental retardation" with "intellectual disability" in the Listings. Change
in Terminology: "Mental Retardation" to "Intellectual Disability", 78 Fed. Reg.
46499-01 (Aug. 1, 2013).  Because the underlying administrative proceedings
concluded and this judicial action commenced before that regulatory change, this
Recommendation utilizes the prior nomenclature.

3) "a physical or other mental impairment imposing an additional and significant work-related limitation of function (Prong 3)," id. (internal quotation marks omitted).

In this case, the ALJ acknowledged that Plaintiff met Prongs 2 and 3 of Listing 12.05C, in that he "did have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function . . . ." (Tr. 27.) The ALJ, however, ruled that "the record shows that [he] lacks the adaptive deficits required by [Prong 1 of] the listing." (Id.; see also id. ("The record does not establish that [Plaintiff's] mental impairments began before age 22.").) In support of that determination, the ALJ stated, in relevant part, as follows:

> The record does not contain IQ scores from [Plaintiff's] school years but does reveal that [he] graduated from high school and went on to perform years of gainful employment. Although [Plaintiff] reported and his representative argues that [Plaintiff] took special education classes and received tutoring throughout his school years, that by itself does not establish deficits in adaptive functioning that initially manifested during [Plaintiff's] developmental period before the age of 22. . . .
>
> According to the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-R) (4th Ed. Rev. 1994) at page 39, adaptive deficits are significant limitations in adaptive functioning in at least two of the following areas: communication, self-care, home living, social or interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.

11

[Plaintiff] underwent a psychological consultative evaluation on June 16, 2008 by Dr. Jake Ricketson. . . . Overall, Dr. Ricketson maintained that [Plaintiff] demonstrated mild maladaptive intellectual impairment.

. . . Although Dr. Ricketson diagnosed [Plaintiff] with mild mental retardation . . ., he opined that [Plaintiff] had only borderline adaptive nonverbal deficits with mild overall intellectual deficiencies. Dr. Ricketson also noted [Plaintiff's] history of good academic and work ethic, indicating that those qualities may lead people to overestimate [Plaintiff's] cognitive abilities. Dr. Ricketson maintained that [Plaintiff] was capable of sustaining concentration and persistence for the performance of unskilled work activities. . . . [Plaintiff] has . . . moderate difficulties in maintaining social functioning[ and] moderate difficulties in maintaining concentration, persistence or pace . . . . There is no evidence that he cannot get along with neighbors, public agencies, co-workers, supervisors, or authority figures in general. [Plaintiff] worked over 15 years as a gutter installer and reported no problems with co-workers or supervisors. There is no evidence that [Plaintiff] has ever been fired from a job or asked to leave due to mental limitations.

In pursuing his claim for benefits, [Plaintiff] completed multiple forms and has demonstrated a reasonable ability to read and write. Additionally, [Plaintiff] testified that he graduated high school and, while he reported low grades in most classes and receiving special education services, he also said that he did very well in woodworking and other shop classes, which were hands-on. He described his work history, indicating that at times he provided on-the-job training for others. He said that he is able to read but is not very good at it and he acknowledged watching television and movies at home, and attending church regularly. Based on [Plaintiff's] work history, education history, and self-reported activities of daily living, it is concluded that [Plaintiff] does not have the adaptive deficits required for a diagnosis of mild mental retardation.

(Tr. 27-28 (emphasis added) (internal parenthetical citations omitted).)

12

As courts have recognized, Listing 12.05C "does not expressly define 'deficits in adaptive functioning' . . . ." Blancas v. Astrue, 690 F. Supp. 2d 464, 476 (W.D. Tex. 2010); accord O'Neal v. Commissioner of Soc. Sec., 614 F. App'x 456, 459 (11th Cir. 2015); Hager v. Astrue, No. 2:09CV1357, 2011 WL 1299509, at *2 (S.D.W. Va. Mar. 31, 2011) (unpublished). Here (as quoted above), the ALJ filled that definitional void by looking to the DSM-IV-R. Although the Social Security Administration ("SSA") expressly has refused to mandate that approach, the SSA explicitly has authorized that approach, as reflected in this explanation the SSA gave upon declining to amend the Mental Retardation listing in 2002:

> One commenter recommended that we use the definition of mental retardation (MR) found in the Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994) (DSM-IV), published by the American Psychiatric Association, as the definition of MR in listing 12.05 . . . .
>
> We did not adopt the comment. The definition of MR we use in our listings is consistent with, if not identical to, the definitions of MR used by the leading professional organizations. The four major professional organizations in the United States that deal with MR have each established their own definition of MR. While all the definitions require significant deficits in intellectual functioning, as evidenced by IQ scores of approximately 70 or below, age of onset and the method of measuring the required deficits in adaptive functioning differ among the organizations.
>
> For example, the definition of MR used in the DSM-IV is predominantly based on (but not identical to) the revised definition of MR promulgated by the American Association on Mental Retardation (AAMR) in 1993. The DSM-IV states: "The essential feature of mental retardation is significantly subaverage general intellectual functioning

13

(further defined as an IQ standard score of approximately 70 or below), that is accompanied by <u>significant limitations in at least two of the following</u> skill areas: <u>communication</u>, self-care, home living, <u>social/ interpersonal skills</u>, use of community resources, <u>self-direction</u>, <u>functional academic skills</u>, work, leisure, health, and safety.  The onset must occur before age 18 years."

Following publication of this new definition of MR by the AAMR, the American Psychological Association published its own "Manual of Diagnosis and Professional Practice in Mental Retardation, 1996."  It states: "Mental retardation refers to (a) significant limitations in general intellectual functioning; (b) significant limitations in adaptive functioning, which exist concurrently; and (c) onset of intellectual and adaptive limitations before the age of 22 years." In its definition, (a) is defined as "an IQ or comparable normed score that is two or more standard deviations below the population mean for the measure;" and for (b), "the criterion of significance is a summary index score that is two or more standard deviations below the mean."

The definition of MR used by SSA in the listings is not restricted to diagnostic uses alone, nor does it seek to endorse the methodology of one professional organization over another.  While capturing the essence of the definitions used by the professional organizations, it also is used to determine eligibility for disability benefits.  <u>SSA's definition establishes the necessary elements, while allowing use of any of the measurement methods recognized and endorsed by the professional organizations</u>."

<u>Technical Revisions to Medical Criteria for Determinations of Disability</u>, 67 Fed. Reg. 20018-01, 20022 (Apr. 24, 2002) (internal asterisks omitted) (emphasis added); <u>see also</u> <u>Charette v. Astrue</u>, 508 F. App'x 551, 553 (7th Cir. 2013) (construing foregoing regulatory language as "stat[ing] that use of [DSM-IV-R's] measurement tools is optional").

14

As quoted above, the measurement method from the DSM-IV-R (permissibly) selected by the ALJ in regards to the adaptive deficits requirement (of Prong 1 of Listing 12.05C) deems adaptive deficits established if an individual exhibits "significant limitations in adaptive functioning in at least two of the following areas: communication, self-care, home living, social or interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." (Tr. 27.) The ALJ further found that Plaintiff suffered from "moderate difficulties in maintaining social functioning[ and] moderate difficulties in maintaining concentration, persistence or pace" (Tr. 28 (emphasis added)), but nonetheless concluded that Plaintiff "lack[ed] the adaptive deficits required by [Prong 1 of] the listing" (Tr. 27). In other words, "while finding [P]laintiff not to have 'significant' deficits in [the] adaptive functioning [areas of social skills and self-direction], the ALJ did find [P]laintiff to have moderate difficulties in social functioning and in concentration, persistence, or pace. These findings tend to contradict the ALJ's determination that [P]laintiff has no significant deficits in adaptive functioning." Mebane v. Colvin, No. 2:13CV43FL, 2014 WL 3510208, at *6 (E.D.N.C. July 15, 2014) (unpublished) (internal citation omitted).

The Court should vacate the ALJ's step three determination and remand for further administrative proceedings because "[t]he ALJ

15

d[id] not squarely resolve the apparent conflict between these rulings [regarding Plaintiff's social skills and self-direction]." Id.; accord Harris v. Colvin, No. 2:13CV28109, 2015 WL 268246, at *16 (S.D.W. Va. Jan. 20, 2015) (unpublished) ("[T]he ALJ's written decision cannot withstand scrutiny. Her findings of moderate limitations in two categories of adaptive functioning [i.e., social functioning and concentration, persistence, or pace], by themselves, tend to negate her unsupported statement that 'the deficits in adaptive functioning needed to establish mental retardation are simply not present.'"); see also Blancas, 690 F. Supp. 2d at 477 (observing that, although Listing 12.05C "does not specify what degree of deficit is required (mild versus [moderate], for example)," because Prong 1 of Listing 12.05C also applies to Listing 12.05D, the degree of "deficits necessary to satisfy [Prong 1] would appear to be less than the [Prong 3] criteria of Listing 12.05D, which requires 'marked' restriction of activities of daily living and social functioning").[6]

In addition, despite adopting a measurement standard for "adaptive deficits" (under Prong 1 of Listing 12.05C) that treats such deficits as proven upon a showing of "significant limitations" in (1) "communication" and (2) "functional academic skills" (Tr. 27), the ALJ did not address Dr. Ricketson's conclusions that

---

[6] Related SSA regulations use this "five-point scale: None, mild, moderate, marked, and extreme." 20 C.F.R. § 416.920a(c)(4).

Plaintiff experienced (A) "severe Communication deficits" (Tr. 378; see also Tr. 377 (documenting that "[Plaintiff's] wife assist[ed] in the interview [with Dr. Ricketson] and help[ed] to get the information . . . [and] help[ed Plaintiff] to respond to questions that he d[id] not fully comprehend")) and (B) "functional illiteracy . . . with his reading and writing skills falling close to the border of 1st-2nd grade level equivalent" (Tr. 378; see also id. (noting that Plaintiff's reading test score fell "at the 1st percentile")). (See Tr. 27-28.)  The absence of such analysis also requires a remand.  See, e.g., Harris, 2015 WL 268246, at *16 ("[T]he ALJ specifically noted that [the c]laimant was diagnosed . . . as functionally illiterate, a finding that is patently inconsistent with [the ALJ's] statement that [the c]laimant had no adaptive deficits consistent with a diagnosis of mental retardation."); Cox v. Commissioner of Soc. Sec., No. 1:11CV317, 2012 WL 4748347, at *10 (E.D. Tenn. Sept. 7, 2012) (unpublished) (recommending remand where a psychologist found deficits in "communication" and "academic skills," but the ALJ failed to discuss – and apparently failed to consider – [that] significant information"), recommendation adopted, 2012 WL 4748472 (E.D. Tenn. Oct. 4, 2012) (unpublished).[7]

---

[7]  The administrative reconsideration of this matter should include a review of the viability of the ALJ's apparent determination that, by "complet[ing] multiple forms" while pursuing disability benefits, Plaintiff "demonstrated a reasonable ability to read and write" (Tr. 28), in light of the above-referenced expert
(continued...)

Nor, in the face of the foregoing considerations, should the
Court refrain from remanding based on the ALJ's invocation of
Plaintiff's "work history, education history, and self-reported
activities of daily living, [as support for the] conclu[sion] that
[he] does not have the adaptive deficits required" (Tr. 28). The
activities of daily living cited by the ALJ consist only of
Plaintiff "watching television and movies at home, and attending
church regularly." (Id.) Such endeavors do not, at least on their
face, manifest a lack of adaptive deficits, see, e.g., Davis v.
Colvin, No. 2:10CV88, 2015 WL 3504984, at *6 (M.D. Tenn. May 28,
2015) (unpublished) ("The fact that [the plaintiff] can watch
television and play cards and video games is also not inconsistent
with a finding of deficits in adaptive functioning . . . .");
Hughes v. Colvin, No. 14C1883, 2015 WL 2259833, at *18 (N.D. Ill.
May 12, 2015) (unpublished) ("Watching TV, decorating, talking on
the phone to relatives and going to church hardly indicate that
[the plaintiff's mental condition] does not limit her in some way
. . . ."), particularly when considered alongside Dr. Ricketson's
opinion that Plaintiff "would have a difficult time . . . living
independently" and that "his present condition prevents him from
managing benefits" (Tr. 378-79; see also Tr. 524, 527-28 (setting

---

[7] (...continued)
evidence describing him as functionally illiterate, as well as other evidence
indicating that he submitted the instant DIB application orally and received
assistance from his wife to complete required paperwork (see Tr. 334, 527).

18

forth Plaintiff's testimony that his wife and, before her, his mother handled his finances)), see, e.g., Owens v. Colvin, No. 1:14CV620, 2015 WL 1120156, at *7 (M.D. Ala. Mar. 12, 2015) (unpublished) (remanding for new determination as to Listing 12.05C, in part, because the ALJ did not adequately address evidence from "psychologists opin[ing] that [the claimant] could not manage benefits . . . [or] live independently").[8]

As to Plaintiff's educational history, the ALJ mentioned only two things that conceivably could favor a finding that Plaintiff did not possess adaptive deficits, i.e., he graduated from high school and "did very well in woodworking and other shop classes, which were hands-on." (Tr. 27-28.) The former consideration does not constitute substantial evidence that Plaintiff lacked adaptive deficits, given the evidence (not discredited by the ALJ (see id.)) that Plaintiff's high school graduation resulted from social promotion and special education placements that effectively trumped his regular receipt of very low and/or failing grades in academic courses (Tr. 525, 542-43). See, e.g., Lyons v. Colvin, No. 7:13CV614, 2014 WL 826789, at *9 (N.D.N.Y. Sept. 14, 2014)

---

[8] In connection with the RFC assessment, the ALJ stated that "the portion of [Dr. Ricketson's] opinion maintaining that [Plaintiff] has significant adaptive deficits is entitled to little weight because it is inconsistent with [Plaintiff's] work and educational history." (Tr. 35.) For reasons detailed in the discussion above to follow, the ALJ's analysis of Plaintiff's work and educational history does not provide an adequate basis to conclude that he lacks adaptive deficits. That inadequate analysis likewise cannot support the discounting of Dr. Ricketson's opinion(s) about Plaintiff's adaptive deficits.

(unpublished) ("The fact that [the plaintiff] graduated after his long history of special education . . . does not mean, a fortiori, that he lacked deficits in adaptive functioning . . . ."); Lewis v. Astrue, No. C06-6608-SI, 2008 WL 191415, at *6 (N.D. Cal. Jan. 22, 2008) (unpublished) ("Completing high school does not bar a claimant from meeting Listing 12.05(C), particularly where claimant was enrolled in special education classes."); Brewer v. Barnhart, No. 4:02CV83, 2005 WL 2429935, at *4 (W.D. Va. Sept. 19, 2005) (unpublished) (ruling that evidence "[the] plaintiff was awarded 'social promotions' . . . [and] performed poorly in school" supported finding of adaptive deficits). Similarly, Plaintiff's performance in "shop" classes cannot provide a foundation for the ALJ to find an absence of adaptive deficits, especially in light of evidence that supplemental instruction from family members outside of school may have contributed to Plaintiff's success in that form of vocational training (see Tr. 548). See Owens v. Astrue, No. 1:06CV68, 2007 WL 895132, at *13 (W.D. Va. Mar. 23, 2007) (unpublished) (holding that "complet[ing] a vocational program in welding" and graduating from high school "with a vocational diploma" represent "accomplishments . . . not inconsistent with an individual functioning in the mentally retarded range").

Turning to Plaintiff's work history, that subject rightfully may bear upon the adaptive deficits inquiry, see, e.g., Cheatum v. Astrue, 388 F. App'x 574, 576 n.3 (8th Cir. 2010); Caldwell v.

Astrue, No. 1:09CV233, 2011 WL 4945959, at *4 (W.D.N.C. Oct. 18, 2011) (unpublished); "[h]owever, the fact that a claimant has been able to work in the past does not necessarily suggest that the claimant does not satisfy the deficits in adaptive functioning requirement. . . . 'Listing 12.05(C) assume[s] many, if not most, mildly mentally retarded individuals will be able to work . . . [but that they may] subsequently become disabled due to the development of additional severe impairments.'" Shaw v. Astrue, No. 4:08CV132-D(2), 2009 WL 2486932, at *6-7 (E.D.N.C. Aug. 13, 2009) (unpublished) (quoting Muntzert v. Astrue, 502 F. Supp. 2d 1148, 1158 (D. Kan. 2007)); accord Davis v. Astrue, C/A No. 2:07-1621-JFA-RSC, 2008 WL 1826493, at *4 (D.S.C. Apr. 23, 2008) (unpublished). In this instance, the Court should remand because "the ALJ appears to have placed improper weight on [prior employment] evidence and failed to consider the possibility that [Plaintiff] might have met [Prong 1 of Listing 12.05C] in spite of h[is] history of [work-related] functionality." Brooks v. Astrue, No. 2:10CV37D, 2011 WL 3882283, at *8 (E.D.N.C. Aug. 17, 2011) (unpublished), recommendation adopted, 2011 WL 3904104 (E.D.N.C. Sept. 2, 2011) (unpublished).

Finally, the ALJ rejected Plaintiff's showing under Prong 1 of Listing 12.05 on the ground that "[t]he record does not establish that [Plaintiff's] mental impairments began before age 22." (Tr. 27.) That rationale cannot stand because the Fourth Circuit has

adopted the position that a claimant's "low IQ manifested itself in deficits in [the claimant's] adaptive behavior before age 22 . . . [where] there is no evidence that [the claimant's] IQ had changed, and [there is] evidence that [the claimant] could barely read or write . . . ." Luckey v. United States Dep't of Health & Human Servs., 890 F.2d 666, 668 (4th Cir. 1989).[9] Here, the ALJ accepted that Plaintiff possessed a low IQ score. (Tr. 27.) Further, record evidence confirms his functional illiteracy. (Tr. 378.) Moreover, consistent with the above-noted evidence of Plaintiff's school-age intellectual dysfunction (Tr. 525, 542-43), neither the ALJ (see Tr. 27-28) nor Defendant (see Docket Entry 16 at 5-12) has pointed to any evidence suggesting that Plaintiff's IQ dropped to its now-acknowledged retardation-level due to events post-dating his 22nd birthday. In other words, as in Luckey, the record of this case appears to reflect that Plaintiff experienced the onset of mental retardation well before age 22.

In sum, the Court should remand for additional administrative consideration of Listing 12.05C.

---

[9] "Listing 12.05C has been amended since Luckey was decided. . . . [However,] deficits in adaptive functioning prior to age 22 have always been an important aspect of the § 12.05C inquiry. In fact, the Luckey panel defined its first issue as 'whether [the plaintiff's] low IQ manifested itself in deficits in his adaptive behavior before age 22.' Luckey, 890 F.2d at 668. . . . Therefore, Luckey is still authoritative." Salmons v. Astrue, No. 5:10CV195-RLV, 2012 WL 1884485, at *3 (W.D.N.C. May 23, 2012) (unpublished) (internal ellipses omitted); see also Dye v. Astrue, No. 6:09CV95, 2010 WL 1380132, at *3 (S.D.W. Va. Mar. 30, 2010) (unpublished) ("My review of the applicable law has revealed that Luckey . . . [is] still good law in this circuit.").

## 2. **Need for Vocational Expert Testimony**

"If the claimant reaches step five, the burden shifts to the [Commissioner] to produce evidence that other jobs exist in the national economy that the claimant can perform considering his age, education, and work experience." Hunter, 993 F.2d at 35. "The Commissioner may meet this burden by relying on the Medical-Vocational Guidelines (Grids) or by calling a vocational expert to testify." Aistrop v. Barnhart, 36 F. App'x 145, 146 (4th Cir. 2002) (citing 20 C.F.R. § 404.1566).[10] Plaintiff's second assignment of error asserts that, under the facts of this case, "[t]he ALJ committed error by failing to obtain the testimony of a vocational expert." (Docket Entry 12 at 10 (italics omitted).)

More precisely, Plaintiff has contended that, because (as documented in Section II.B.1.) the ALJ found Plaintiff to have moderate difficulties with concentration, persistence, and pace ("CPP"), the ALJ should not have relied on the Grids to resolve step five, but instead should have called a vocational expert.

---

[10] "The Grids categorize jobs by their physical-exertion requirements . . . . There are numbered tables for the sedentary, light, and medium level . . . and a specific rule for the heavy and very heavy levels. Based on the claimant's RFC, the ALJ must first determine which table [or rule] to apply . . . . Next, based on the claimant's age, education, and previous work experience, the [table or] rule directs a finding of 'disabled' or 'not disabled.'" Black v. Astrue, No. 3:09CV599, 2010 WL 2306130, at *4 (E.D. Va. Apr. 26, 2010) (unpublished) (internal citations and footnotes omitted), recommendation adopted, 2010 WL 2306136 (E.D. Va. June 3, 2010) (unpublished). "[W]hen a non-exertional impairment exists, the testimony of a [VE] is normally required," Hooper v. Heckler, 752 F.2d 83, 88 (4th Cir. 1985); however, "not every non-exertional limitation . . . preclude[s] reliance on the Grids," Walker v. Bowen, 889 F.2d 47, 49 (4th Cir. 1989).

(See id. at 10-11.)  Defendant has responded that the ALJ properly looked to the Grids because:

A) the ALJ accounted for Plaintiff's CPP limitations by "'restrict[ing] him to the performance of simple, routine, repetitive tasks ["SRRTs"] in an environment that required only occasional interaction with supervisors'" (Docket Entry 16 at 14 (second set of brackets in original) (quoting Tr. 29)); and

B) "the ALJ found that Plaintiff's restriction to SRRTs with only occasional interaction with supervisors had 'little or no effect' on the occupational base of work reflected in the Grids" (id. (quoting Tr. 36)).

"The limitation to [SRRTs], or unskilled work, has been found not to so erode the sedentary job base as to preclude reliance on the [G]rids."  Callahan v. Colvin, No. 7:13CV132RJ, 2014 WL 4843958, at *8 (E.D.N.C. Sept. 29, 2014) (unpublished).  However, "the work base for [a claimant] may be substantially eroded . . . [if the claimant] can only 'occasionally interact with co-workers, supervisors or the public.  'Occasionally' is defined for most purposes as one-third of a work day.  Under that definition, for two-thirds of a work day [such a claimant] would be unable to respond appropriately to co-workers, supervisors or the public." Garver v. Astrue, No. 09CV2259WYD, 2011 WL 1134721, at *17 n.12 (D. Colo. Mar. 28, 2011) (unpublished) (internal citations omitted).  Because the ALJ did not explain why Plaintiff's inability to

24

interact with supervisors other than occasionally (i.e., for no more than one-third of a work day) would cause little, if any, reduction in the sedentary job base (see Tr. 36), the Court should vacate the ALJ's step five ruling and should remand for further administrative proceedings on point.  See generally Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000) ("[The ALJ] must articulate some legitimate reason for his decision."); Wyatt v. Bowen, No. 89-2943, 887 F.2d 1082 (table), 1989 WL 117940, at *4 (4th Cir. Sept. 11, 1989) (unpublished) ("[T]he duty of explanation will be satisfied when the ALJ presents '[the court] with findings and determinations sufficiently articulated to permit meaningful judicial review,' which must include specific reference to the evidence producing [the ALJ's] conclusion." (quoting DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983), and citing Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985))).[11]

---

[11]  If, on remand, the ALJ again reaches step five and "the extent of erosion of the unskilled sedentary occupational base [from the restriction to only occasional interaction with supervisors] is not clear, the [ALJ] may consult various authoritative written resources, such as the DOT [Dictionary of Occupational Titles] . . . ."  Social Security Ruling 96-9P, Policy Interpretation Ruling Titles II and XVI:  Determining Capability to Do Other Work – Implications of a Residual Functional Capacity for Less than a Full Range of Sedentary Work, 1996 WL 374185, at *9 (July 2, 1996).  Alternatively, the ALJ "may use the resources of a vocational specialist or vocational expert.  The vocational resource may be asked to provide any or all of the following:  An analysis of the impact of the RFC upon the full range of sedentary work, which the [ALJ] may consider in determining the extent of the erosion of the occupational base, examples of occupations the individual may be able to perform, and citations of the existence and number of jobs in such occupations in the national economy."  Id. (internal footnote omitted).

Moreover, since the ALJ issued the decision under review, the Fourth Circuit has held that, in general, "an ALJ does not account for a claimant's limitations in [CPP] by restricting the [claimant] to [SRRTs] . . . [because] the ability to perform simple tasks differs from the ability to stay on task." Mascio v. Colvin, 780 F.3d 632, 638 (4th Cir. 2015). "Perhaps the ALJ can explain why [Plaintiff's] moderate limitation in [CPP] . . . does not translate into a limitation in [his RFC beyond restriction to SRRTs]. . . . But because the ALJ here gave no [such] explanation, a remand is in order [on that front as well]." Id.[12]

### 3. Social Security Ruling 96-8p

Plaintiff's third (and final) assignment of error maintains that "[t]he ALJ erred by failing to make the more detailed assessment required by [Social Security Ruling] 96-8p." (Docket Entry 12 at 16 (italics omitted).) The Fourth Circuit recently has explained that said "Ruling instructs that the [RFC] 'assessment must first identify the individual's functional limitations or

---

[12] Plaintiff also has suggested that the RFC should have narrowed the available sedentary jobs beyond a restriction to SRRTs, on the ground that he lacked the reasoning ability generally required for even such low-level work as SRRTs. (See Docket Entry 12 at 11-12.) However, as Defendant has observed, "[t]he only evidence that Plaintiff cite[d] in support of this argument is Dr. Ricketson's report . . . [which concluded] that [Plaintiff] was 'able to perform routine, repetitive tasks as observed and reflected in the test data.'" (Docket Entry 16 at 14 (quoting Tr. 379).) As a final matter, Plaintiff's second assignment of error asserts that, in formulating the RFC and opting to rely on the Grids, the ALJ did not adequately account for Plaintiff's pain. (See Docket Entry 12 at 13-15.) After careful review, the undersigned United States Magistrate Judge concludes that, for reasons well-explained by Defendant (see Docket Entry 16 at 16-19), the ALJ did not reversibly err in that regard.

restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions' listed in the regulations. . . . [The RFC] 'assessment must include a narrative discussion describing how the evidence supports each conclusion, citing medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).'" Mascio, 780 F.3d at 636 (quoting Social Security Ruling 96-8p, Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 61 Fed. Reg. 34474, 34475, 34478 (July 2, 1996)). If, upon remand, administrative review proceeds beyond step three, any RFC formulation must comply with these dictates by the Fourth Circuit.

## III. CONCLUSION

Plaintiff has established grounds warranting remand for further administrative proceedings.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be vacated, that Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 11) be granted in part (i.e., to the extent it requests remand), that Defendant's Motion for Judgment on the Pleadings (Docket Entry 15) be denied, and that this matter be remanded for further administrative proceedings as to (1) whether Plaintiff meets Listing 12.05C, (2) whether (and, if so, why) Plaintiff's inability to interact with supervisors for more than one-third of a work day would cause little, if any,

27

reduction in the sedentary job base, (3) why, for purposes of assessing an RFC, restricting Plaintiff to SRRTs adequately accounts for his moderate limitation in CPP (or, alternatively, whether additional restrictions should apply), (4) whether a function-by-function analysis of Plaintiff's mental impairment supports adoption of any other RFC restrictions, and (5) whether any restrictions included in Plaintiff's RFC (as assessed on remand) preclude reliance on the Grids at step five.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

March 23, 2016